Case number 17-3493, United States of America v. Robert Bannister. Argument not to exceed 15 minutes per side. Mr. Noah Hood, you may proceed for the appellant. May it please the Court, Noah P. Hood on behalf of the plaintiff appellant, the United States of America. Your Honors, I've requested, with the Court's permission, two minutes for rebuttal. Your Honors, there's three specific reasons that jump to the forefront for why this Court should reverse and remand for resentencing. First, the sentencing Court did not adequately consider the sentencing guideline range, but rather employed a different methodology that focused specifically on how the defendant did on pretrial release. Second, the Court assigned an unreasonable weight to one sentencing factor in particular, in fact, a sliver of a sentencing factor, which is the history and characteristics, focusing only on the 18 months that Mr. Bannister spent on pretrial release as opposed to the 30 years leading up to his arrest. And third, the Court did not adequately explain how its noncustodial sentence, a 77-month downward variance, provided for general deterrence. Your Honors, at its core, each of these three reasons, and the other reasons identified in our briefs, relate to a broader issue, which is a failure to appropriately weigh the sentencing factors. And ultimately, that is the abuse of discretion here. The question, the critical inquiry for this Court is, was the justification for this noncustodial sentence? At the end of the day, I mean, Judge Carr did talk about the guidelines. He did explain in excruciatingly painful detail his reasoning with respect to the sentence. I mean, this is pretty much an appeal that says, you know, my judgment as an assistant U.S. attorney is better than that of the judicial officer who's been a judge for many years, who has seen all kinds of situations, and, you know, what's in a while, not frequently? But it's wise judicial judgment to take a chance on somebody. And I, you know, I don't think anybody would consider me to be a pushover sentencer. But at some point, at some point, you just have to rely on your best judgment. And that's exactly what Jim Carr did here. I mean, it's hard to find legal error in this sentence, I think. He talked about the guidelines. He did what he was supposed to do. He just didn't get to the same point you wanted him to. He talked about the criminal record. I mean, it was terrible. Your Honor, may I respond? Yeah. The Court's correct that the sentencing judge in this case did acknowledge the guideline range, and that's after stating what he intended to do. This Court has consistently recognized the guidelines are supposed to be the starting point. Here, the sentencing judge did not treat the guidelines as a starting point. In fact, the record is pretty explicit that Judge Carr made it clear that the guidelines, instead of being the starting point, were more so a fallback consideration if a defendant did not do well on pretrial release. It's just a tad hyper-technical, because he may not have mentioned the guidelines first, but he got the pre-sentencing report. He saw what the guidelines were. He certainly had considered it, and he talked about it. So just because on the technical record he didn't say guidelines when he walked out and sat down in the chair doesn't mean he didn't consider them. Respectfully, Your Honor, Judge Carr made it clear that he was considering them as a fallback position if a defendant did not do well on pretrial release. What part of the record do you attach that assertion? Your Honor, this is at page ID 307 to 308, specifically where the Court stated that its practice was to release a defendant and then give him an opportunity to succeed on pretrial release, and then, if the defendant fails, at that point the Court considers the sentencing guidelines. This is in conflict with the Sixth Circuit's position on how the guidelines are supposed to function. Specifically— The guidelines, to my knowledge, are not a factor one considers under the bail statute. The sentence can be, I mean, because it's specifically written into the statute, but the guidelines themselves are not a front-end consideration. For sentencing, they are a front-end consideration. But they're not a front-end consideration when you're setting conditions of release. In some situations, the statutory penalty is, but the guidelines are not. That's correct, Your Honor, and just so that I'm clear, what I'm saying is, Judge Carr said in the context of sentencing, he considers how someone does on pretrial release and that his methodology is to release someone, see how they do, and if they mess up, essentially, then he considers the guidelines. This creates two specific issues. One relates to a failure to adequately weigh the guidelines. The other goes to unwarranted sentencing disparities, which is, consider a situation in which, due to the restrictors of the Bail Reform Act, someone isn't able to be out on bond. That person is not able to benefit from this methodology that Judge Carr described in the sentencing transcript. That's absolutely true, but I'm not sure that that leads us to this point. Well, it adds on to the potential unwarranted sentencing disparity, where this defendant has benefited from 18 months on pretrial release, where other similarly situated defendants do not benefit. Frankly, I've been a federal judicial officer since 1983, and I've never seen a defendant who did what this defendant did while he was on pretrial release. Never. Your Honor, if I may respond. Obviously, the defendant's behavior on pretrial release is something that the court has to take into account. What's made clear here, though, is that there was an extraordinarily amount of weight placed on not just one sentencing factor, but one portion of that sentencing factor. Looking at the defendant's history and character for 18 months, as opposed to his entire history and character, which is described in exhaustive detail in the pre-sense report. It describes a series of consistent convictions from age 18 to 45, which involve drug trafficking, thefts, multiple domestic violence convictions, assault, and other violent crimes. Your Honor, this is something where the court focused entirely on this 18 months to the apparent disregard of the rest of Mr. Bannister's history. Your Honor, I would also note that a critical issue here is the need for the sentence imposed to provide general deterrence. This factor requires consideration of general deterrence for similar offenses by society at large. And in fact, this court has consistently recognized general deterrence as one of the primary factors in sentencing considerations. This five-day sentence gave inadequate weight to this factor. And in fact, in the sentencing transcript, Judge Carr appeared to acknowledge some of the concerns raised by Mr. Bannister. In his testimony at page ID 338, the court stated, whether public deterrence is served or not, I don't know, I hope it is, but I must say I cannot say one way or the other. If that's the case, then it appears that that goal of sentencing as identified in 3553 subsection 8-2 does not appear to be accomplished by the sentence imposed. Do you really think that if he had gotten the sentence in the guidelines, that that would have a deterrent effect on all the other drug sellers and so forth in Toledo? Yes, much more so than a non-custodial sentence. How would they know? That's our problem. The prisons are full of these people who are apparently completely undeterred by these long sentences in prison. They keep breaking the law. They keep going to prison. This is a 47-year-old man, and apparently Judge Carr saw something in this fellow that he thought might be a recognition, that he wanted to end what was a long life of crime and actually not die in prison, and he gave him a shot. It's perfectly clear on the record that it was a successful outcome. I understand that this case is way off the bell curve, but I think it would be unfortunate if we said to Judge Carr and said where everybody else could see it, that you can't ever use your discretion in this way. Your Honor, we're not saying that. It's a question of weighing. So if not here, when? Your Honor, it's hard to come up with a hypothetical situation, but I think it deals much more so with the adequate weighing of the different factors and the methodology that the court was using to reach its decision. Okay, that's fine, and if we decide that there wasn't a violation of that principle, we can affirm, can't we? Frankly, Your Honor, I'm not in a position to concede that. Your Honor, I would point out that this sentence itself indicates that there was a breakdown, that certain things were not . . . A more common sentence for this kind of situation would probably be some prison time with the judge giving careful recognition to the defendant's performance while on pre-trial release and making clear that he had been given certain credit for that but that the custodial sentence imposed was necessary to reflect the seriousness of the offense and to take properly into account his prior record. That would have been a more common sentence, and you would have liked that sentence better. But I am not sure that we can say that . . . that any of the things you said about this sentence are true. I mean, I just can't. We have certainly reversed some sentences that seem to sort of make a mockery of the criminal statutes involved. But there is surely, in a rule of advisory guidelines, some room for an exercise of discretion that is extraordinary. Some room. Do you disagree with that? I do not disagree with that, Your Honor. And this is not about sentences that one party likes or one party doesn't like. It's about the appropriate weighing of the factors and justifying that substantial variance. With the appropriate justification, with the appropriate weighing, we don't think that the court would have arrived at this specific sentence, which is to say, if the court considered his 28 years of consistent criminal history context, if the court considered the fact that this purported reformation occurred while Mr. Bannister was facing the threat of sentence for, frankly, possessing 56 grams of cocaine across the street from a school playground, along with a very serious firearm. You know, I will give you this, just so you go away feeling better. When I first saw these briefs at the screening stage of the procedure in this case, I looked at the bare facts and thought, oh, there's got to be something wrong here. And that's what you're feeling, I think, too, because it is out of the ordinary. But then when you see what the trial judge did and how careful he was, you know, I began to come around to a middle view, at least an open-minded view, of what should happen here. It's not wrong of you to come in and argue this at all. And we'll certainly consider your argument. Thank you, Your Honor. Good morning. Good morning. My name is Claire Cahoon Curtis, and I represent Mr. Bannister on behalf of the Federal Public Defender. I will keep my remarks appropriately brief today. I'm certainly happy to answer any follow-up questions that the Court may have. Do you represent this gentleman in the District Court? Yes, Your Honor, along with my co-counsel Donna Grille. Ms. Grille was present at the sentencing hearing. I prepared the sentencing memorandum. Extraordinary circumstances do merit extraordinary variances, and I think that this Court is correct in their remarks to the government that Mr. Bannister is that extraordinary individual who is outside the bell curve of sentencing. We don't know whether he is or not. We don't know what the future holds. Absolutely, Your Honor. We just know that the district judge thought he was worth taking a big, big chance on. Exactly. More to Your Honor's point, at the end of the day, this is a question of deference. Well, you know, I have sort of a different question, and that is what I see that makes sense about Mr. Hood's argument is, or his position in this is, that this wasn't Judge Carr looking at Mr. Bannister in front of him, having certain information, and deciding on the basis of that information that he was worth taking a chance on. In fact, if the judge knew anything about him at all, he knew he had this incredible 35-year criminal history. One wonders, I mean, we now know that he was ready and eager to be rehabilitated, and that he took to rehabilitation like a duck to water, but how in the world would a district court know at the point of pre-release that this was somebody who was worth taking a chance on? And so you have to think that maybe, and I say this as much as I admire Judge Carr, and I have a very deep admiration for him, that he is deciding to do this sort of rogue release program, and that he's releasing people on their own and leaving them out there for a while, when what could happen, if you don't know that this is a person who's going to succeed, what could happen is somebody could get killed, he could commit other crimes, and it would be a horrible situation. So what is it that Judge Carr is taking into consideration at pre-release that convinces him to do this? You must have seen this happen at least once. Do you know, has he done this in a lot of other cases? It sounds like that at ID pages 307, 308. Thank you, Your Honor. To try to address those concerns, two points. One, I don't believe that the government, with all due respect to Mr. Hood, is correct with their transcript, were meant to suggest he has a pattern or a style or a practice of releasing individuals and then see how they do. Well, it sort of sounds like it. I agree that it's a bit confusing in the record. Well, I mean, it doesn't sort of sound like it. I mean, that's the way I read it, too. And I would ask this Court to consider that it seems what Judge Carr is suggesting is that in this individual case, he saw something in Mr. Bannister that suggested to him pre-trial release was appropriate, which of course is not what we're considering here, but then looked to how Mr. Bannister actually did on pre-trial release as one of the things he considered in determining whether or not the non-custodial sentence the defense counsel had asked for was appropriate. And so what Judge Carr knew, in addition to the underlying offense and his record, was that Mr. Bannister did exceptionally well on pre-trial release. And I'm happy to say he's still doing exceptionally well on pre-trial release. And so that was an appropriate consideration amongst the entire panoply of considerations that Judge Carr needed to make when he decided what sentence to impose. How did he consider those things? I mean, how did he consider deterrence, both general and the specific defendant? How did he deal with unwanted disparity? I mean, is it enough to just mention it? And how did he deal with his prior history? Thank you, Your Honor. It would not be enough to just mention them, and I think the record reflects that Judge Carr did a much more searching inquiry here, and I'd like to give the Court a few examples, if I may. In terms of general deterrence, there was a discussion beginning on page ID 329 where Judge Carr explains that the most common reason for him imposing sentences is general deterrence, that that's something that guides, that is a guiding principle of his sentencing strategy. During the conversation about general deterrence, the government pushed back, saying that they didn't believe that a non-custodial sentence would be sufficient to deter, to act as general deterrence. And on page ID 339, Judge Carr says, well, I disagree with you. I think that it would serve general deterrence. Same issue with disparity. I think the government takes a somewhat un-nuanced view here. It's not that It's not enough for a judge to say, I disagree. I mean, that's the same thing as touching on it. What did he say that was convincing? to explain why this specific sentence would serve deterrence. And what Judge Carr explains is because of Mr. Bannister's rehabilitative efforts, extraordinary rehabilitative efforts, it was Judge Carr's opinion in his own discretion that sending Mr. Bannister back to prison would actually have a more deleterious effect on the community than allowing him to remain where he was working in rehabilitation, serving others and working. Because he would slip? No, well, yes, because he would slip, but that that would have a negative impact on public safety and that it wouldn't serve general deterrence. That actually allowing him to stay out was a much better effective servant of general deterrence. Did he get that just Mr. Bannister's background of being incarcerated a good bit plus the sort of reward for doing right would be a model for people to show them how to lead law abiding lives? Is that the idea? I certainly think that's part of what Judge Carr was describing when he was discussing discussing that is exactly general deterrence. I mean, it's sort of something else. Well, I think it might be. I mean, it might or might not be solid reasoning, but I agree with your honor that I think he's talking about general deterrence in terms of what other similarly situated individuals might take from Mr. Bannister's example. And then also he's talking about disparity in terms of whether a disparity exists is not the issue. It's whether the disparity is unwarranted, right? As this court has certainly articulated many times. And so I think Judge Carr acknowledges, all right, this is an extraordinary variance, but I think under these circumstances, this is a warranted disparity. Counsel, is it common in Toledo for people to be left out on pretrial release for as long as a year and a half? Not to my knowledge, Your Honor. And this is, of course, the Court of Appeals, so I don't want to get too anecdotal, but I know that my office was quite surprised that we received pretrial release for this person. So I can say anecdotally that's not been my experience. I'm still going back to what did he know? What did Judge Carr know or see that made him decide to let it go on? It seems abnormally long. It was going well. That's not my point. But just what was it that made him decide? And I ask myself that, and I still think it's probably that Judge Carr's seen enough of these cases to know that there are very few people that are over 45 who are still engaging in criminal activity and going to prison. Just the age of this fellow might have provoked some hope that he was ready to quit. I think you're right, Your Honor. I can't point to anything specific in the record to answer your question other than Mr. Bannister's age and his extraordinary record, which does evidence a long history of drug addiction. And at some point, the court has to say, and I think Judge Carr tried to say here, we need to try something different. This is someone who's gone to prison over and over, and it's made no difference in his reoffending. This is someone who is being driven by a severe drug addiction, and we have to try a different strategy. Had he already made some progress by the time of his pretrial release hearing? Yes, Your Honor. I believe he... Your Honor, I apologize. It's been a minute since I've reviewed the bond hearing record, so I don't have an answer for the court on that. How do you distinguish Musgrave? Sure. And I know Judge Gibbons was the majority author on Musgrave, so I think it's important to discuss why it's so different than this case. So in Musgrave, there were two problems. The first was that there was no discussion of general deterrence. So there was a complete absence of any discussion of deterrence, unlike this case where there's been a discussion, and Judge Carr is explaining his reasoning for why it supports deterrence. The other difference is that in Musgrave, the court relies on an impermissible factor, which is that the defendant was a white-collar criminal, and the judge decided that he had already been punished enough by these sort of ancillary effects of having a criminal case, that he had lost his CPA license, that he'd have to spend a lot of money on legal fees, that he'd been stuck in a legal case for a number of years, that it had reduced his standing in the community. And this court has said over and over that it's not acceptable to treat white-collar criminals differently as though they have more at stake than other kinds of defendants. And so that was part of the reason why Musgrave was remanded. And then if I recall correctly, I believe on remand, Mr. Musgrave received essentially the same sentence, which this court subsequently affirmed when it was again appealed by the government. And what about Bristline? And in Bristline, which is a child pornography case, again, we have a complete absence problem. So in Bristline, there was no discussion of the guidelines, and instead there was a minimization of the conduct by the defendant in that case, because it was receipt of child pornography but not production. And this court determined that it was inappropriate to have no discussion of the guidelines and that there was also an inappropriate minimization of the conduct that wasn't supported by the factors. We had a number of these cases. I'm testing my memory, so if I'm just off. We had a number of these cases in the child pornography area. And I think beneath the surface in those was a tension between judges who didn't think the conduct was as serious as Congress had thought it was. And ultimately, we sort of said, you know, it's not about your... In some of them, we said, you have to give respect to the congressional sentence. We are not the... We're not the folks who decide the sentencing rules. Am I characterizing several of those cases pretty correctly as far as what's under the surface? Yes, Your Honor. A lot of these decisions rely on criticism of the child pornography, either guidelines or the way the statutes are crafted, which obviously is different than the situation we have here. In a lot of ways, Mr. Bannister's sentencing is very straightforward. It's a pretty standard gun and drugs case. Certainly the federal courts see lots of those. We have a defendant who admittedly has a long and very serious criminal record. And this was just one of those rare occasions where the balancing of the severity of the conduct, which Judge Carr acknowledges repeatedly on the record, was just countervailed by the extraordinary efforts he had made on pre-trial release. And Judge Carr believed that this was someone who would not be best served, the community would not be best served, by sending him off for incarceration. I do think it's also worth noting that the government concedes in briefing that Mr. Bannister really did merit a significant variance, just maybe not as much of a variance as he received, which really supports this idea that what the government is doing in this case is asking for this court to simply allow it to relitigate. Ultimately, we use the word reasonable. I mean, someone might hear this and react that that's just crazy. And then you could describe a different sentence, maybe being tethered to the house for a certain amount of time, or maybe it's not three years probation, it's 10 years supervised release, where somebody just the feeling of the reaction of whether it's reasonable changes. I mean, there's something fairly extreme about this. You're absolutely right, Your Honor, that the starting place is reasonableness. I can't hear you. The starting place is reasonableness, and that's assessed under the totality of the circumstances. And again, this court defers to the district court, so unless the government can point to a legal error, which I don't believe they've done, then this is a reasonable sentence balanced under the 3553A factors. An example would be this court's decision in Davis from last year, where we had a variance of 100 percent upward in, I believe it was in a child pornography case. So the volume or percentage of the variance doesn't necessarily undermine its reasonableness, and certainly this court has said a sentence outside the guidelines is not per se unreasonable. As long as the judge makes an appropriate balance of the factors, looks to the guidelines, and does all the things that he or she is required to do, then that sentence is within the judge's discretion and should be affirmed by this court. In closing, I would just note that there's been some discussion about whether Judge Carr appropriately considered the guidelines, and it's not uncommon for this judge and most district court judges to forecast where they might be heading at the beginning of sentencing if they have strong feelings based on briefing. In this case, the defense did provide a very comprehensive sentencing memo asking for a noncustodial sentence, and so that was already in Judge Carr's mind, the government having provided no sentencing memorandum at the time that sentencing began. But Judge Carr, although he explained to the government, hey, I'm leaning in that direction, immediately pivots to say, all right, let's talk about what the guidelines are. And so that was the basis of the court's determination. Your Honors, there's two related points that I would like to respond to. The first relates to general deterrence. I believe there was a question about whether or not the court adequately explained how the sentence accomplished general deterrence, and the reference was made to page ID 339. Specifically, at that point in the transcript, the court pivots from general deterrence to promoting public safety, and does not address general deterrence. The specific quote is, this is after the Bostic question, the court stated, I think someone who is fully aware of all the circumstances would gain respect for the law, et cetera, and pivots to protecting the community without addressing specifically why the sentence, the noncustodial sentence, accomplishes general deterrence. There was a reference to Musgrave and the potential distinguishing factors. Obviously, Musgrave involved a white-collar crime, but specifically, there was a reference to the fact that the court in Musgrave considered the collateral consequences of the conviction. That's kind of what's happening here, where the court was considering whether or not a custodial sentence would frustrate Mr. Bannister's purported rehabilitation efforts, and the thought that perhaps going to prison would cause him to have some sort of a relapse. In that sense, I think there's an argument to be made that the court, similar to the court in Musgrave, considered the collateral consequences of the sentence as opposed to the sentence itself. Finally, there was a question about the 18 months on pretrial release, and I just wanted to address that. There were some factors that contributed to that. There was a question about whether or not Mr. Bannister demonstrated any rehabilitation before that. He was in custody for five days before that. There was a self-reporting of a drug addiction issue, which the United States, in this case, contested at that time. Noting that each time Mr. Bannister was arrested on a drug case, he had between $300 and $1,000 in his pocket, and that was not an indication of drug addiction, but rather drug trafficking. Your Honors, this case is about whether or not the court provided substantial justification for this substantial variance. Thank you, Your Honors. Mr. Hood, let me just say this, and this is something that I've long believed. I told you what I thought of general deterrence when you're dealing with drug dealers in this kind of mid-level crime. Where general deterrence really works is with white-collar criminals. Somebody prominent in the community who does something really bad, people pay attention to that. White-collar crime, for example, people pay attention. Let me just suggest that you ruminate about that a little, because I think when somebody pleads guilty and goes to prison, in this case it would have been 77 months, the general deterrence factor there is really very thin. Your Honor, would you like me to respond? I would just note that I think the court is correct, obviously, that general deterrence is important in the white-collar context, as the Sixth Circuit has recognized, but it's important in any context. Well, I'll give you that. That's fine. It's just where it really shows up is where you're making an example of somebody, and the entire community notes the example. I would just point out that the inverse is true. When someone gets a noncustodial sentence for a very serious crime, there is an inverse deterrent effect. Thank you, Your Honors. We appreciate the argument that both of you have given in this rather unusual case, and we will consider it carefully. Thank you.